IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

CASE NO. 5:18-CR-282-BO

| UNITED STATES OF AMERICA | **BRIEF IN OPPOSITION TO MOTION TO SUPPRESS** |
|---|---|
| v. | |
| FRANKIE LEE JONES | |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, respectfully opposes the defendant's motion to suppress his confession. [DE 28] The defendant's argument relies entirely upon his purported I.Q. of 61. But the relevant question is whether he actually understood his rights. Settled case law, the video of his confession, and even the defendant's own expert prove that he did.

RELEVANT FACTS

Beginning around January 2017, the defendant had an online relationship with a thirteen-year-old boy, I.W., who suffers from learning disabilities. The defendant and I.W. met through a social media app, Kik, and then communicated by apps, texts, and on the phone. The defendant used phone number 910-729-7735, which was registered to him.

Law enforcement later recovered I.W.'s phone and found nearly 7,000 text messages between the defendant and I.W. dating from January 22, 2017, until March 5, 2017. The text messages showed that the defendant and I.W. were in nearly constant communication by text, on the phone, and on app. In hundreds of texts, the

1

defendant and I.W. discussed their romantic and sexual attraction to each other in very explicit terms. [Gov't Ex. 2][1] They also discussed plans for I.W. to come live with the defendant and for the two to marry and start a family. [Gov't Ex. 3]

The defendant also repeatedly solicited I.W. for naked pictures and videos. After receiving many pictures or videos, the defendant directed I.W. how to take more sexually gratifying pictures and commented on how satisfying he found I.W.'s images. Dozens of images displaying I.W.'s genitals were later recovered. [Gov't Ex. 4]

There is no question that the defendant knew I.W.'s true age. In the texts, I.W. discussed being a middle-school student and living with his mom and grandparents. On January 31, 2017, the defendant asked I.W. for his date of birth and social security number, which I.W. provided. [Gov't Ex. 5] The next day, the defendant took out a life insurance policy naming I.W. as his beneficiary. [Gov't Ex. 8] And on February 22, 2017, the defendant texted, "I know I'm 32 and ur are 13 baby but I love you I would love to marry you now." [Gov't Ex. 5 at 6]

For weeks, I.W. and the defendant planned for the defendant to take I.W. to a motel for a weekend to have sex. Eventually they settled on Friday, March 3, 2017. In the days before March 3, the two planned their trip extensively, discussing details like what I.W. would pack and where the defendant should pick I.W. up. They also discussed how to get I.W.'s mother's permission for the trip. Eventually the defendant

---

[1] To read the text message exhibits, read from the bottom of each page to the top. The victim labeled the defendant's contact as "Folks My Hit The*." Thus, messages labeled "From" "Folks My Hit The*" are from the defendant; those sent "To" that contact were sent by the victim. Particularly pertinent text messages are highlighted in yellow. The government has organized text messages topically and included only representative samples on each subject.

2

told I.W. that he had texted I.W.'s mother from a fake number; he also instructed I.W. to lie and claim that the text came from I.W.'s friend's father. [Gov't Ex. 6]

As arranged, on March 3, 2017, the defendant picked I.W. up near I.W.'s home in Raleigh and drove him to Fayetteville. The two then spent the weekend at the Coliseum Inn at Fayetteville in a room rented in the defendant's name. According to I.W. and the defendant, the two had sexual intercourse, oral and anal, at the motel. I.W. stated that the encounters were not consensual;[2] the defendant claimed that I.W. initiated all sexual activity. I.W. reported that the defendant took pictures of his anus; the defendant claimed I.W. took those pictures himself. Both agreed that I.W. struggled with anal intercourse, and the defendant bought lubricant. The defendant also took I.W. to buy new shoes at Foot Locker Kids.

Meanwhile, I.W. had not told his family where he was going. On March 3, I.W.'s mother received a text from a strange number asking whether I.W. could spend the night, and she said no. After the family realized I.W. was gone, they reported him missing and frantically tried to contact him. Late Saturday night, I.W.'s aunt had managed to reach him and persuade him to come home. And by then, the situation between the defendant and I.W. had soured. The defendant returned I.W. to a street near I.W.'s home in Raleigh in the early hours of March 5, 2017. He then texted I.W. that he never wanted to see or speak to I.W. again and would change his number. [Gov't Ex. 7]

---

[2] In text messages, I.W. expressed desire to engage in sexual activity with the defendant. But I.W. also was a thirteen-year-old child with learning disabilities who had lost his father the previous year. It appears that he did not fully appreciate the reality of what he was discussing with the defendant.

3

I.W. did not initially disclose what had happened to his family. But later that day, I.W. collapsed at home and lost consciousness. EMS responded and rushed him to the hospital. He later provided a statement describing his weekend with the defendant.

Detective Sheets of the Cumberland County Sheriff's Office interviewed the defendant while he was in custody on unrelated charges. Det. Sheets advised the defendant of his *Miranda* rights, and the defendant acknowledged and waived them. [Gov't Ex. 1, vid. 1, 0:45;[3] Def. Ex. A] The defendant then confessed to knowing I.W. and to taking him to the motel in Fayetteville for the weekend. The defendant claimed that I.W. initiated sexual contact and that he stopped when I.W. became uncomfortable. He did admit to having oral, anal, and manual sexual contact with I.W. The defendant claimed that I.W. took pictures of I.W.'s anus with the defendant's phone. He said he had since factory-reset the phone and given it to his nephew. [Gov't Ex. 1]

The defendant repeatedly denied knowing I.W.'s age. He claimed that I.W. had said he was eighteen and only admitted the truth during the weekend. The defendant claimed that he returned I.W. to Raleigh and told him not to contact him after learning I.W.'s true age. At the end of the interview, the defendant consented to providing a buccal DNA swab and then volunteered two phone numbers in case detectives had further questions. [Gov't Ex. 1]

---

[3] The video confession is broken into two videos due to length. The government has cited the videos as "vid. 1" and vid. 2" to clarify which one the government is referring to.

On July 25, 2018, a federal grand jury returned a six-count indictment against the defendant, charging him with production of child pornography, 18 U.S.C. § 2251(a) and (e), and online enticement, 18 U.S.C. § 2422(b). On November 12, 2018, the defendant moved to suppress his confession. [DE 28] The government now responds.

ARGUMENT

This Court should deny the defendant's motion. Settled Fourth Circuit precedent provides that a defendant's low I.Q. does not invalidate his *Miranda* waiver unless he states that he does not understand his rights. This defendant never expressed any confusion and instead confirmed, repeatedly, that he understood. The video of the defendant's waiver and confession further proves that he appreciated the consequences of waiving *Miranda*. He had no difficulties during the interview and deliberately lied to make his statements less damning. Not even the defendant's own expert opines that he could not understand his rights. The defendant's motion fails.

A. *The Defendant Knowingly Waived* Miranda *because He Repeatedly Acknowledged That He Understood His Rights.*

A defendant's "below average I.Q. does not make him per se incapable of intelligently waiving his rights." *United States v. Robinson*, 404 F.3d 850, 861 (4th Cir. 2005). The Fourth Circuit has found a knowing waiver for defendants with I.Q.s of 70, 69, and 68. *Id.* (fifteen-year-old defendant); *Bone v. Polk*, 441 F. App'x 193, 196 (4th Cir. 2011); *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995). Even an I.Q. of 62—just one point higher than the defendant's purported I.Q.—is sufficient. *Robinson*, 404 F.3d at 861 (citing with approval *Moore v. Duggar*, 856 F.2d 129, 134-

35 (11th Cir. 1988). No found Fourth Circuit case has ever invalidated a waiver based on low I.Q.

"In cases involving defendants with low intellectual ability, the knowingness of the waiver often turns on whether the defendant expressed an inability to understand the rights as they were recited." *Robinson*, 404 F.3d 850, 861 (4th Cir. 2005). Here, the defendant never said he could not understand his right and instead confirmed, repeatedly, that he did. The video of the defendant's entire confession, including his *Miranda* waiver, proves as much.

The video shows that Det. Sheets patiently explained the defendant's rights, reciting them line by line from the rights form. While reading each line, Det. Sheets spoke slowly, used simple English, and pointed to the line on the waiver form as he read it. [Gov't Ex. 1, vid. 1, 0:45 to 2:55; Def. Ex. A] After each line, Det. Sheets stopped and the defendant whether he understood. And after each line, the defendant verbally stated that he understood his rights. [Gov't Ex. 1, vid. 1, 0:45 to 2:55] He signed the waiver form, acknowledging in writing that he understood his rights. [Def. Ex. A]

The defendant *never* indicated that he did not understand his rights, Det. Sheets's explanation, or the form. And the defendant was capable of doing so. Later in that very same interview, Det. Sheets asked the defendant to consent to provide a buccal DNA swab. After Det. Sheets reviewed the DNA consent form with him, the defendant asked clarifying questions, and then confirmed that he now understood.

[Gov't Ex. 1, vid. 2, 4:40] The defendant did not do so when reviewing the *Miranda* form because he understood it.

The defendant asks this Court to follow an out-of-circuit district court opinion holding that an executed rights form was not sufficient when a defendant had a low I.Q. [DE 28 at 6-8] But that holding conflicts with the Fourth Circuit's binding precedents explaining that a waiver is valid when the defendant never "expressed an inability to understand the rights as they were recited." *Robinson*, 404 F.3d at 861; *Bone*, 441 F. App'x at 196-97.[4]

Because the defendant never expressed such an inability and instead confirmed, repeatedly, that he understood his rights, his motion fails.

   B. *The Video of the Defendant's Waiver and Confession Proves That He Understood the Explanation of Rights and the Consequences of Giving a Statement to Law Enforcement.*

Moreover, "evidence contemporaneous to [the defendant's] confession which indicates that he knowingly and intentionally waived his *Miranda* rights" will "eclipse[]" any concerns about a defendant's I.Q. *Bone*, 441 F. App'x at 197. Here, the rest of the defendant's video confession proves that he was able to understand questions and instructions and specifically understood the consequences of speaking to police. *See Smith v. Duckworth*, 824 F.3d 1233, 1247-48 (10th Cir. 2016) (relying on evidence in the defendant's "videotaped interview" to affirm a *Miranda* waiver);

---

[4] The defendant also attempts to distinguish *Robinson*, *Correll*, and *Bone* by arguing that those cases relied on a defendant's "street smarts." [DE 28 at 5-6 & n.3] The Fourth Circuit merely noted those defendants' street smarts as further confirmation that they indeed understood their rights. The court never held that street smarts were a prerequisite; *Robinson* and *Bone* clearly stated that the issued "turn[ed]" on whether the defendant indicated a lack of understanding. *Robinson*, 404 F.3d at 861; *Bone*, 441 F. App'x at 196-97.

*see also Frazier v. Jenkins*, 770 F.3d 485, 502 n.10 (6th Cir. 2014) (citing a video confession as evidence supporting a knowing waiver).

> 1. Throughout the interview, the defendant understood and intelligently responded to questions and instructions.

The defendant promptly and intelligently responded to Det. Sheets's questions and statements during the interview. For example, after completing the *Miranda* waiver, Det. Sheets engaged the defendant in chit-chat about the defendant's education, work history, and recent vehicle activity. The defendant answered promptly, correctly, and coherently. The defendant had no comprehension difficulties then or any other time. [Gov't Ex. 1, vid. 1, 3:25-11:20]

The defendant's consent to a DNA swab is another useful example. A DNA swab is a much more sophisticated concept than the idea that the police can use one's confession in court. Yet the defendant understood what a buccal DNA swab was, asked follow-up questions to clarify how the swab would be used, and then consented to it being taken. Moreover, he successfully took *his own buccal cheek swabs* by following the detective's instructions. [Gov't Ex. 1, vid. 2, 4:40, 11:22] If the defendant could understand and then take a buccal DNA swab based on Det. Sheets's explanation, he certainly could understand the very simple rights form.

In fact, the only times the defendant seemed to struggle were when Det. Sheets confronted him with bad facts. When Det. Sheets brought up I.W. for the first time, the defendant paused. He also took a long time to answer the first time Det. Sheets pressed him about when he really learned I.W.'s true age and when Det. Sheets asked him if he had digitally penetrated I.W. [Gov't Ex. 1, vid. 1, 11:28, 25:28, 35:41] Each

time, he understood the questions—he was trying to decide how best to respond without incriminating himself too much.

> 2. The defendant lied, minimized, and twisted bad facts because he understood that his statements could be used against him.

Indeed, the defendant deliberately concealed or lied about bad facts throughout the interview. Most tellingly, the defendant repeatedly *lied about knowing the victim's true age*. The defendant maintained throughout that I.W. claimed to be eighteen and only revealed his true age at some point during the weekend of March 3 through 5. [Gov't Ex. 1, vid. 1, 13:07, 25:28, 28:05, 42:15, 42:40, 44:38, 45:20, 47:34] He claimed to be shocked to learn I.W.'s true age. Twice he said that after learning the truth, he had told I.W. that their relationship was wrong and that he could get in trouble for it. He even claimed that he took I.W. home because he learned I.W.'s true age and that, if he had known the truth, he never would have spent the weekend with I.W. [Gov't Ex. 1, vid. 1, 13:07, 25:28, 28:05, 42:15, 42:40, 44:38, 45:20, 47:34; Gov't Ex. 1, vid. 2, 2:00]

Of course, the text messages flatly contradict this nonsense. The defendant knew for weeks, even months, exactly how old I.W. was. [Gov't Ex. 5] Far from being concerned, the defendant actually said, "I know I'm 32 and ur are 13 baby but I love you I would love to marry you now." [Gov't Ex. 5 at 6] He lied to Det. Sheets to make his conduct look less heinous.

The defendant shaded the truth to minimize his culpability in other ways. He blamed I.W. for the idea to meet in person. [Gov't Ex. 1, vid. 1, 14:50, 49:35; vid. 2, 0:28] He also claimed that *I.W.* initiated sexual contact, determined the position they

9

used, and asked to be digitally penetrated anally. [Gov't Ex. 1, vid. 1, 25:13, 29:39, 35:41] He said that I.W. took pictures of his own anus and took many other pictures of himself—leaving out the fact that the defendant solicited those pictures. [Gov't Ex. 1, vid. 1, 39:37, 40:44; Gov't Ex. 4]

In fact, the defendant left a lot of inconvenient facts out. He did not mention months of text messages in which he and I.W. expressed their desire for each other and their plans to be together in the future. [Gov't Ex. 2] He did not mention his active role in planning to meet in person. [Gov't Ex. 6] Despite hundreds of text messages in which he described, graphically, wanting to sexually penetrate I.W., the defendant even told Det. Sheets that he was "surprised" to find I.W. naked in bed. [Gov't Ex. 1, vid. 1, 25:13; Gov't Ex. 2; Gov't Ex. 3]

Why lie? Why minimize? Why blame I.W.? *Because the defendant understood that his words could be used against him.* If the defendant truly did not understand that Det. Sheets could use his statements in court, the defendant would have simply admitted that he knew I.W.'s age, that he planned a sexual weekend together, and that he was an active (and almost certainly leading) participant in sexual activity. He did not.

Instead, the defendant knew that the police could use his words against him. He also knew that the police had some incriminating information, but he did not know how much they knew. After all, they recovered the text messages from *I.W.'s* phone because the defendant had conveniently factory reset and given away his own.[5] So he

---

[5] Gov't Ex. 1, vid. 1, 40:11. That action alone suggests he understood the consequences of his *Miranda* waiver.

did what criminals of all intelligence levels often do when caught: he tried to come up with a plausible story that minimized his culpability.

By lying, concealing, and misrepresenting bad facts, the defendant proved that he understood the consequences of his waiver. *See Bone*, 441 F. App'x at 197 (defendant's statement that he knew "[s]ome people need to be in prison" showed that he understood "the consequences of the decision to abandon his *Miranda* rights"). His motion therefore fails.

C. *Not Even the Defendant's Own Expert Supports His Argument.*

The defendant's motion fails for another reason: he has offered absolutely no evidence to support it. He relies entirely on his purported I.Q. of 61 but offers no facts or evidence actually showing that he did not understand the rights as Det. Sheets advised them. But it is the evidence of what the defendant actually understood—not his raw I.Q. score—that determines whether his waiver was knowing. *See Bone*, 441 F. App'x at 197; *Robinson*, 404 F.3d at 861.

And in any event, the defendant's own expert does not support his argument. She opined only that he was competent. She offered no opinion about his *Miranda* waiver; she did not even mention his confession. [Def. Ex. C] That omission is glaring. Dr. Coleman is an able and experienced forensic psychologist. She reviewed "a copy of [the defendant's] statement to authorities." [Def. Ex. C at 1] She easily could have opined that the defendant could not understand his *Miranda* rights. *Compare, e.g.*, *Bone*, 441 F. App'x at 197 (the defendant's expert opined that he "demonstrated a very limited understanding of his *Miranda* rights"); *Garner v. Mitchell*, 557 F.3d 257,

11

263 (6th Cir. 2009) (defendant's expert questioned whether "he could or did understand the consequences of" signing a waiver form). Dr. Coleman's silence speaks volumes.

At bottom, the defendant's videotaped confession defeats this motion. It proves that the defendant understood his rights and intelligently chose to waive them. Not even his own expert disagrees.

CONCLUSION

For the foregoing reasons, this Court should deny the defendant's motion to suppress his confession.

Respectfully submitted this 17th day of December, 2018.

ROBERT J. HIGDON, JR.
United States Attorney

/s/ Erin C. Blondel
Assistant United States Attorney
Criminal Division
U.S. Attorney's Office, EDNC
310 New Bern Avenue, Suite 800
Raleigh, North Carolina 27601
erin.blondel@usdoj.gov
Telephone: 919-856-4004
Fax: 919-856-4487
NC Bar No. 46977

CERTIFICATE OF SERVICE

This certifies that a copy of this motion and its exhibits have, this 17th day of December, 2018, been served upon the defendant by CM/ECF and email as follows:

Halerie Mahan
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, NC 27601

/s/ Erin C. Blondel
Assistant United States Attorney
Criminal Division
U.S. Attorney's Office, EDNC
310 New Bern Avenue, Suite 800
Raleigh, North Carolina 27601
erin.blondel@usdoj.gov
Telephone: 919-856-4004
Fax: 919-856-4487
NC Bar No. 46977